## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                         No. CR 04-1978 JB

ROBERT MICHAEL HANRAHAN,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence and Statements, filed June 23, 2005 (Doc. 34).  The Court held a hearing on this motion on July 18, 2005.  The primary questions are: (i) whether the stop of Defendant Robert Michael Hanrahan was a valid traffic stop; and (ii) whether Officer Levi Justin Swinton's pre-Miranda question was permissible.  Because the Court concludes that the stop was a valid traffic stop, and because Swinton's question was within the scope of that traffic stop, the Court will deny the motion to suppress.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to

search.  See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence except those with respect to privileges do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.  On July 15, 2004, Bernalillo County Sheriff's Deputy Lawrence Tonna received a report that several males had been involved either in a fight between several male persons or in the attempted burglary of parked automobiles.  See Transcript of Hearing at 5:9-16 (filed July 20, 2005)(hereinafter "Transcript");[1] id. at 9:12-16.

2.  At 12:46 a.m., Tonna was dispatched to the area of 1014 Ortega Rd. in Albuquerque to investigate.  See id. at 5:12-16.

3.  Dispatch then advised Tonna that at least two male subjects had left the area eastbound on Ortega Rd. in a primer gray colored, late model -- 1970's or 1980's -- Ford pickup truck.  See id. at 9:14-20.

4.  Upon Tonna's arrival at the address, several neighbors advised that the suspect's truck had turned north on Guadalupe Trail.  See id. at 9:23 - 10:6.

5.  Tonna attempted to locate the suspicious truck in the area.  See id. at 11:21-25.

6.  A short while later, Tonna saw a gray truck matching the description given by citizen complaintants at the scene of the automobile burglaries traveling eastbound on Leo Road.  See id. at 12:7-11; id. at 14:4-8.  Tonna had his headlights on when he saw the truck.  See id. at 14:15-17.

7.  Tonna observed the truck stop at the intersection and then cross the intersection of

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

Guadalupe Trail.  See id. at 12:14-17; id. at 14:21-23.

8.  Tonna was traveling very slowly when he saw the truck.  See id. at 80:5-12.

9.  At the time he first saw the truck, Tonna was perpendicular to the truck on the driver's side.  See id. at 13:8-14.

10.  Tonna pulled in behind the suspect's truck and illuminated the vehicle's rear.  See id. at 15:1-3.

11.  Tonna noticed that the truck had a hard license plate displayed in the cab's passenger side rear windshield.  See id. at 15:8-11; id. at 16:15-25.

12.  The license plate was facing the vehicle's rear.  See id. at 15:8-11; id. at 15:15-17.  The license plate was not behind the driver's head, but was behind the passenger's head, if there had been a passenger.  See id. at 15:8-11.  The license plate was not on a side window.  See id.

13.  Tonna immediately observed and concluded that the truck which Hanrahan was driving was improperly displaying a license plate in the rear windshield rather than on the rear bumper, and that it had an expired New Mexico registration or license tag from March of 1996.  See id. at 15:5-6; id. at 15:8-19; id. at 17:9-11; id. at 55:11-15.

14.  The expired and improperly displayed license plate was visible from the truck's rear.  See id. at 16:7-14.

15.  Tonna effected a traffic stop on Hanrahan's truck near 9420 South Guadalupe Trail.  See id. at 17:12-13; id. at 19:8-13.

16.  At the time of the stop, Hanrahan was driving a gray 1972 Ford pick-up truck.  See id. at 17:9-13.

17. The vehicle was in close proximity to the reported attempted burglaries of vehicles. See id. at 14:9-11.

18. At that time of night, shortly after midnight, in that area, there was very little traffic on the streets. See id. at 5:13; id. at 12:18-20.

19. The stretch of road on which the stop occurred does not have any streetlights. See id. at 56:13-15.

20. The general area in which the stop occurred contains a mixture of private residences, businesses, and farmland. See id. at 4:14-24. Thus, there are some residences in the area where the stop occurred. See id. at 18:21-25.

21. Hanrahan was the vehicle's only occupant. See id. at 18:16-18.

22. After calling for backup, Tonna approached the vehicle and made contact with Hanrahan. See id. at 18:8-9; id. at 18:15-18.

23. Tonna asked Hanrahan to produce identification, his driver's license, registration, and proof of insurance. See id. at 19:17-20.

24. Hanrahan did not have the requested documents, and responded that he had no paperwork with him. See id. at 19:21-22; id. at 20:1-3.

25. At that time, Tonna noticed that the truck's ignition mechanism was damaged and dangling out of its cradle. See id. at 20:14-15.

26. Tonna also saw that the steering column was broken. See id. at 20:11-13.

27. Both the damaged ignition mechanism and steering column indicated to Tonna that the vehicle was possibly stolen. See id. at 20:16-18.

28. As Tonna made these observations, two backup deputies, Deputy Levi Justin Swint and

Deputy Priemazon, arrived at the scene in two separate police cars.  See id. at 21:6-9.

29.  Tonna ordered Hanrahan to step out of the truck and to the vehicle's rear.  See id. at 21:10-11; id. at 21:21-22.

30.  Tonna asked for Hanrahan's full name, date of birth, and social security number.  See id. at 29:14-16.  Priemazon was standing at the rear of the truck with Tonna.  See id. at 30:24 - 31:1.

31.  As Tonna asked these questions, Swint walked by the truck's open driver's side door and saw, in plain view, a tiny, metal, silver-colored pistol next to the seat belt buckle of the driver's side bench seat.  See id. at 31:15-19; id. at 86:8-9; id. at 93:5-25; id. at 94:1-13.

32.  The pistol was so small that Swint asked Hanrahan whether the item was a gun or a lighter.  See id. at 94:15-18.

33.  Hanrahan responded: "It's a gun, but my friend left it in there.  It doesn't have the internal guts to work."  Id. at 94:22-23.

34.  Swint secured the gun, which contained no bullets.  See id. at 67:25; id. at 68:1; id. at 95:20-25; id. at 96:1-6.

35.  Tonna placed handcuffs on Hanrahan and took him to his patrol car.  See id. at 32:15-18; id. at 35:4-6.

36.  Tonna then read Hanrahan his Miranda rights.  See id. at 35:6-8.

37.  Hanrahan acknowledged that he understood his Miranda rights and agreed to speak with Tonna.  See id. at 38:14-18.

38.  Tonna asked about the gun, and Hanrahan stated that the handgun did not belong to him.  See id. at 39:18-20.

39.  Tonna observed numerous tattoos on Hanrahan, including some indicating that he could

be associated with a prison gang.  See id. at 39:20-23.

40.  Tonna asked Hanrahan if he had served time, and Hanrahan admitted that he spent six years in the New Mexico State Penitentiary in Santa Fe for armed robbery.  See id. at 39:23 - 40:1.

41.  After confirming through the National Crime Information Center ("NCIC") and dispatch that Hanrahan was a convicted felon, Tonna arrested him for being a felon in possession of a firearm. See id. at 40:2-11; id. at 82:14-19.

42.  At no time during the detention or arrest did any deputy draw a weapon.  See id. at 97:16-18.

43.  At the suppression hearing on April 5, 2005, Tonna and Swinton testified credibly about the events and statements described above.

## PROCEDURAL BACKGROUND

In April 2005, Hanrahan's counsel traveled to Albuquerque to talk to Tonna and Swint.  The visit's intent was to clarify some of the details of Hanrahan's stop.  After arriving in Albuquerque, Hanrahan's attorney was told the interviews could not to take place.  The analysis in his motion is therefore based on his attorney's observations of the area of Albuquerque where the events took place.

Hanrahan moves the Court, under rule 12(b)(3) of the Federal Rules of Criminal Procedure, for an order suppressing from use at trial any evidence seized as a result of an illegal stop and any statements taken from Hanrahan as a result of the interrogation conducted in violation of his rights under the Fourth Amendment and under Miranda v. Arizona, 384 U.S. 436 (1966).  In connection with the requested evidentiary hearing, Hanrahan requests, pursuant to rule 26.2, that the United States disclose to his counsel at least forty-eight hours before hearing any statements, including grand

-6-

jury testimony, of suppression hearing witnesses.  Hanrahan makes this request to avoid delays in the conduct of the hearing.

## LAW REGARDING TRAFFIC STOPS AND TERRY STOPS

"A traffic stop is a seizure within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995)(quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  Because a motorist's detention during a typical traffic stop is, however, "presumptively temporary" and the "circumstances associated with the [] stop are not such that the motorist feels completely at the mercy of the police," Berkemer v. McCarty, 468 U.S. 420, 437-38 (1984), traffic stops are more analogous to investigative detentions than to custodial arrests, see id. at 439.  See also United States v. Botero-Ospina, 71 F.3d at 786; United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995); United States v. Walker, 933 F.2d 812, 815 (10th Cir. 1991).  As such, courts analyze the constitutionality of traffic stops under the reasonableness standard set forth by the Supreme Court of the United States in Terry v. Ohio, 392 U.S. 1 (1968).  See id. at 19-20 (holding that, to determine the reasonableness of an investigative detention, courts must inquire as to "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place"); United States v. Botero-Ospina, 71 F.3d at 786; United States v. Walker, 933 F.2d at 815.

Applying this reasonableness standard, the United States Court of Appeals for the Tenth Circuit held that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  United States v. Botero-Ospina 71 F.3d at 787.

Terry v. Ohio establishes that such reasonable suspicion requires more than an "inchoate and unparticularized suspicion" and must be supported by "specific and articulable facts."  392 U.S. at 21, 27-30.

### LAW REGARDING MIRANDA WARNINGS

1.    **General rule.**

Miranda v. Arizona 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'" United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  Thus, for Miranda v. Arizona to apply, "the questioning must meet the legal definition of 'interrogation'" and "the suspect must be in 'custody.'"  Id. at 1463.  An "interrogation" includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Generally, custody exists where a reasonable person in the defendant's position would not think he is free to leave.  See United States v. Jones, 933 F.2d 807, 810 (10th Cir. 1991).   As the Supreme Court, however, articulated in Berkemer v. McCarty, not every curtailment of a person's "freedom of action" constitutes taking that person into "custody" for the purposes of Miranda v. Arizona.  468 U.S. at 436-39.  Rather, for Miranda v. Arizona to apply, "a suspect's freedom of action [must be] curtailed to a 'degree associated with formal arrest.'"  Id. at 440 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).

2.    **Traffic Stops.**

In Berkemer v. McCarty, the Supreme Court discussed custodial interrogations and the applicability of Miranda v. Arizona in the context of traffic stops.  See 468 U.S. at 420.  The Supreme

Court opined that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." Id. at 440.  There, the Supreme Court held that the roadside questioning of a motorist detained pursuant to a routine traffic stop did not constitute a custodial interrogation for the purposes of Miranda v. Arizona, so that pre-arrest statements which the motorist made in response to general questions were admissible against the motorist.  See id. at 441-42.

The Supreme Court in Berkemer v. McCarty noted:

> Two features of an ordinary traffic stop mitigate the danger that a person will be induced "to speak where he would not otherwise do so freely[.]"  Miranda v. Arizona, 384 U.S.[] at 467, 86 S.Ct.[] at 1624.  First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. . . .  A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may be given a citation, but that in the end he most likely will be allowed to continue on his way. . . .  Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. . . . [T]he typical traffic stop is public, at least to some degree. . . . The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability.  In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in Miranda itself . . . .

Id. at 437-39.  The majority opinion in Berkemer v. McCarty, however, carefully distinguished those situations in which officers have detained individuals pursuant to traffic stops, but subjected them to more intrusive treatment thereafter: "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda."  Id. at 440.

Thus, in a routine traffic stop, officers need not issue Miranda warnings.  "[L]aw enforcement personnel may make a routine traffic stop and may ask a moderate number of questions to determine

the occupants' identities and 'and to try to obtain information confirming or dispelling the officer's suspicions' without being required to advise the individuals of their *Miranda* rights." <u>United States v. Martinez</u>, 983 F.2d 968, 976 (10th Cir. 1992)(quoting <u>Berkemer v. McCarty</u>, 468 U.S. at 439, 442)(internal citations omitted).

In addition to not requiring that officers advise individuals of their <u>Miranda</u> rights, the Tenth Circuit also permits officers, for safety reasons, to obtain information about the existence of loaded weapons during the course of a routine traffic stop. <u>See</u> <u>United States v. Holt</u>, 264 F.3d 1215, 1223 (10th Cir. 2001). As the Tenth Circuit stated:

> In addition to information about loaded weapons that the officer may obtain from visually looking in the car, shining a light around the interior of the car, or asking the motorist and occupants to step out of the car or to keep their hands raised--all procedures authorized by the courts in the name of officer safety--an officer may also obtain information about the existence of a loaded weapon by simply asking the motorist if there is a loaded weapon in the vehicle.

<u>Id.</u> Citing numerous statistics regarding the number of officers assaulted during traffic stops, the Tenth Circuit reasoned: "[G]iven the 'inordinate risks confronting an officer as he approaches a person seated in an automobile[,]'" the government's interest in officer safety outweighs the "individual-privacy-interests side of the Fourth Amendment balancing." <u>Id.</u> at 1222 (citation omitted).

**3.      <u>Terry</u> Stops.**

Similarly, during the course of a typical <u>Terry</u> stop, analogous in its brevity and limited scope to a traffic stop, the law does not require <u>Miranda</u> warnings because the suspect is not in "custody" where warnings are required. <u>See</u> <u>United States v. Perdue</u>, 8 F.3d at 1463-64.

> This view has prevailed because the typical police-citizen encounter envisioned by the Court in *Terry* usually involves no more than a very brief detention without the aid

of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is "substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda*."

Id. at 1464 (quoting Berkemer v. McCarty, 468 U.S. at 439).  In United States v. Perdue, the Tenth Circuit noted that Miranda warnings are, however, required during Terry stops where an individual's "freedom of action [is] curtailed in a 'significant way.'"  Id. at 1465 (quoting Berkemer v. McCarty, 468 U.S. at 435).  There, the officers stopped the defendant in a remote location near where a search warrant was being executed.  See id. at 1458.  With guns drawn, the officers forced the fleeing car to stop, and ordered the defendant to get out of the car and lie face down on the ground.  See id.  The officers then proceeded to question the defendant with weapons still drawn.  See id. at 1459.  Given the "highly intrusive" nature of this Terry stop, the Tenth Circuit held that the defendant was in "custody" for all practical purposes, and as such, the officers should have given the Miranda warnings.  Id. at 1466.

## ANALYSIS

Because the Court concludes that the stop was a valid traffic stop, and because Swinton's question was within the scope of that traffic stop, the Court will deny the motion to suppress.

## I.     THE STOP OF HANRAHAN WAS LEGAL.

Detective Tonna's stop of Hanrahan's primer gray Ford pickup truck was a valid traffic stop, and, therefore, the Court will not grant Hanrahan's motion to suppress on this basis.

Hanrahan argues that the stop of the truck was illegal.  Hanrahan contends that it would have been impossible for Tonna to see the tag from the vehicles' locations.  Hanrahan alleges that Tonna must have been approaching the truck from the front or side, thereby not being able to ascertain the dates on the tags.  The stop took place after midnight.  Hanrahan asserts that the tag was on the

-11-

truck's back passenger window.  Hanrahan argues that Tonna would not have been able to see the tag until after he effected the stop and the bright lights came on.  To support this contention, Hanrahan offered testimony by the tow truck driver, William Muller, Jr., who stated that the truck contained a headache rack on the back of its cab's window, which contained metal strips spaced approximately three-inches apart.  Hanrahan maintains that, because it would have been impossible for Tonna to see the license tag on the truck, and because the United States has not advanced any other legal reason for the stop, the stop was illegal, and the Court should suppress all evidence that the deputies seized as a result of the stop.

The evidence demonstrates, however, that Tonna illuminated the truck's rear.  Tonna describes the area where the license plate was located as the "passenger side rear windshield."  The expired license plate was not on a side window.  Although Muller's testimony raises an inference that Tonna could not see the license plate because of the rack, he handles many vehicles a day,  and it has been one year since the incident.  No one else testified about the headache rack.  Tonna testified credibly that he observed the license plate and expired tag.  The Court finds that the violation was obvious, and that violation justified the stop.

Hanrahan contends that it is a legal practice in New Mexico for temporary license tags to be adhered to the passenger side of the rear windshield of the car.  N.M.S.A. 1978, § 66-3-18(B) provides that temporary license plates and permits "shall be displayed in . . . a manner that it is clearly visible from the rear or left side of the vehicle," and states that individuals may place tags on the passenger's side of the rear windshield if placing it on the driver's side would present a safety hazard or visibility issue.  Subsection B, however, applies only to "temporary demonstration plates and temporary permits."  Id.  Tonna testified that the plate on Hanrahan's vehicle was a hard, aluminum

plate, not a temporary tag. <u>See</u> Transcript at 16:15-17. Thus, that Hanrahan displayed a permanent metal plate on the inside of the truck's cab raises compliance issues with state law. Tonna does not have to be right, and his credible belief that there was a traffic violation justified the traffic stop.

Unable to establish his original version of events, Hanrahan argues that it is difficult to understand how Tonna could have observed the temporary license tag at 12:46 a.m. in an area of town that is void of streetlights. But Tonna testified that the license was visible because it was not located on the side window, but on the rear windshield facing the back of the vehicle on the truck's passenger side of the cab. It is credible that he could have seen the license tag because it was placed high on the truck on the passenger window and within the beam of the officer's headlights.

Based on this evidence, the Court concludes that Tonna, when he pulled Hanrahan's vehicle over, effectuated a legal traffic stop.

## II.   HANRAHAN'S STATEMENTS ARE ADMISSIBLE AT TRIAL.

Hanrahan next argues that the Court should suppress his statement in response to the question regarding the nature of the object on the truck's seat. The law does not support Hanrahan's contention.

There is no dispute the deputies did not advise Hanrahan of his rights under <u>Miranda v. Arizona</u> until after he had answered Swint's question: "Is that a lighter or a gun?" But the pre-<u>Miranda</u> question does not constitute a custodial interrogation. Accordingly, <u>Miranda</u> warnings were not required.

At the time of the question, Hanrahan was not in custody. Tonna initially stopped Hanrahan pursuant to a traffic stop for an expired license plate and registration tag. His response to Swint's question was within the scope of a routine traffic stop.

-13-

While, at the time he made the statement, he had been stopped, ordered to step out of his vehicle, led to the truck's rear, and detained by at least two uniformed and armed police officers, he was not in custody for Miranda purposes.  The case's facts do not remove it from the routine traffic stop.  The detention that followed was not so intensive that it brings the case outside the scope of the ordinary traffic stop.  Hanrahan was not physically restrained.  Hanrahan's detention was brief.  Tonna questioned him briefly, and the detention was not substantially "police dominated" in the manner that the Supreme Court contemplated in Berkemer v. McCarty.  While it was dark, the location was not deserted, but was in a residential area.  There is no reason for the Court to conclude that the presence of two armed officers apprehending him was particularly daunting.  Hanrahan's treatment was not much more demanding than a routine traffic stop.  Because his treatment did not render him "in custody" for practical purposes, Hanrahan was not entitled to receive "the full panoply of protections prescribed by Miranda."  Berkemer v. McCarty, 468 U.S. at 440.

The questioning also was not an interrogation for Miranda purposes.  The nature of the officer's question -- whether it was a gun or a lighter -- suggests that the officer was not asking any questions about any crime.  As in United States v. Martinez, the defendant was not in custody, and the police were not physically restraining Hanrahan.  Swint observed the object on the truck's bench seat.  It was readily accessible to Hanrahan, who was not handcuffed.  Swint prudently and lawfully determined that the object was a firearm, and secured the firearm.  See United States v. Holt, 264 F.3d at 1223.[2]

---

[2] The facts of this case are different from those in United States v. Perdue.  The atmosphere in United States v. Perdue is not present in this case.  Tonna detained Hanrahan for a brief period while he attempted to ascertain whether he lawfully possessed the vehicle.  The detention did not rise to the custody that the Tenth Circuit discussed in United States v. Perdue.

The Court, therefore, concludes that Hanrahan's pre-<u>Miranda</u> statement in response to Swint's question is admissible.

**IT IS ORDERED** that the Defendant's Motion to Suppress Evidence and Statements is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Johnny Sutton
   United States Attorney
Judith A. Patton
   Assistant United States Attorney
San Antonio, Texas

     *Attorneys for the Plaintiff*

Jane Greek
Barbara Mendel
   Assistant Federal Public Defenders
Federal Public Defender's Office
Las Cruces, New Mexico

     *Attorneys for the Defendant*