## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff-Respondent,

v.

                                      No. CIV 09-0219 JB/KBM
                                       No. CR   04-1978 JB

ROBERT MICHAEL HANRAHAN,

       Defendant-Movant.

### MEMORANDUM OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on Defendant-Movant's Objections to the Magistrate Judge's Proposed Findings and Recommended Disposition Following Evidentiary Hearing on Sole Remaining Issue, filed January 27, 2010 (Doc. 22)("PF&RD"). The primary issues are: (i) whether the Court should hold a new evidentiary hearing on Defendant-Movant Robert Michael Hanrahan's motion for habeas relief under 28 U.S.C. § 2255 to make credibility determinations; (ii) whether the record demonstrates that Jane Greek, Hanrahan's attorney at the trial in which he was convicted and at a prior trial on the same counts, gave ineffective assistance by prohibiting Hanrahan from testifying; and (iii) whether the record demonstrates that Ms. Greek's failure to call Hanrahan to testify effected the outcome of the second trial. The Court finds that, although it arguably is crediting testimony that the Honorable Karen B. Molzen, United States Magistrate Judge, found incredible, that the Court need not hold a new evidentiary hearing because its factual determinations favor Hanrahan and do not change the outcome of the case. The Court also finds that, under Tenth Circuit law, Ms. Greek did not prohibit Hanrahan from testifying in a way that constitutes ineffective assistance of counsel. Moreover, even if Ms. Greek kept Hanrahan

from testifying, his live testimony would not have changed the case's outcome.  Accordingly, the

Court adopts in part the PF&RD and denies Hanrahan's request for relief under 28 U.S.C. § 2255.

## PROCEDURAL BACKGROUND

This habeas proceeding comes after two trials.  In Hanrahan's first trial, the jury hung.  In

the second trial, the jury convicted Hanrahan.  One important distinction between the two trials is

that, in the first trial, Hanrahan testified in his defense.  In the second trial, Hanrahan did not testify.

Hanrahan asserts that his trial counsel made statements that, in his view, deprived him of his right

to testify at trial.  He states that he twice stated to trial counsel that he desired to testify, and that,

in response, his counsel told him "We're not putting you on the stand," and "You're not testifying."

When he asked why, his counsel told him that she was concerned that he would be impeached by

his prior testimony and said that it would "be alright," at which point he did not press the issue.

After granting the United States' unopposed motion for an order finding that Hanrahan had

waived his attorney-client privilege, Judge Molzen conducted an evidentiary hearing where

Hanrahan and his trial attorney testified.  See Government's Amended Motion for a Court Order

Finding Petitioner Waived the Attorney-Client Privilege Through Claims Raised in Motion Filed

Pursuant to 28 U.S.C. § 2255 at 6, filed November 20, 2009 (Doc. 18); Order Finding Waiver of

Privilege, filed November 23, 2009 (Doc. 19).  The court reporter thereafter filed the transcript of

the evidentiary hearing, and Judge Molzen filed her PF&RD, recommending that the Court deny the

sole remaining claim.[1]

---

[1] Hanrahan's objections -- filed February 14, 2010 -- were timely filed.  See Robert
Hanrahan's Objections to the Magistrate's Proposed Findings and Recommended Disposition, filed
February 14, 2010 (Doc. 23)("Objections").  The Federal Rules of Civil Procedure permit electronic
filing and service.  See Fed. R. Civ. P. 5(b)(2)(E) ("A paper is served under this rule by . . . sending
it by electronic means if the person consented in writing"); Fed. R. Civ. P. 5(d)(3) ("A court may,
by local rule, allow papers to be filed . .  by electronic means . . . .  A local rule may require

## RELEVANT LAW ON INEFFECTIVE ASSISTANCE OF COUNSEL

The Supreme Court of the United States has long recognized that "the right to counsel is the right to effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

_____

electronic filing . . . ."). The United States District Court for the District of New Mexico has made electronic filing mandatory, and the Court serves documents on parties electronically unless the case involves "exceptional circumstance," which is not the case here. D.N.M.-CM/ECF Admin. Procs. Manual § 1(a) ("[U]nless otherwise excepted [for certain documents not relevant here] electronic filing is mandatory in the United States District Court for the District of New Mexico.")(effective 8/28/06, as revised 10/1/08); id. § 8(b)(1)-(2) (stating that the court-generated "Notice of Electronic Filing (NEF) . . . is the official notice of the filing to all parties and [for those mandatory participants] is the equivalent of service by first class mail."). Under this District's local rules, an electronic filing "constitutes service for purposes of Fed. R. Civ. P. 5," and "an electronic document is considered filed on the date of the electronic transfer [as] reflected in the Court's" NEF. D.N.M. LR-Civ. 5.1 (a)-(b).

Judge Molzen filed her proposed findings on Wednesday, January 27, 2010 at 4:05 p.m., and the method of notice and service for Defendant's counsel was electronic. See PF&RD (attached NEF). As is required, the proposed findings notify the parties that, under 28 U.S.C. § 636 (b)(1), a party must file objections within "fourteen days of service" or else appellate review is waived. PF&RD at 16. See Fed. R. Civ. P. 72(b)(2) ("Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."). Because this Court's local rules do not specify how to compute time for objections to a Magistrate Judge's proposed findings, rule 6 of the Federal Rules of Civil Procedure governs. See Fed. R. Civ. P. 6(a) ("The following rules apply in computing any time period specified in these rules, in any local rule or court order, or in any statute that does not specify a method of computing time."). Because the period is stated in days, the day that triggered the period is excluded and all other days are counted, "including intermediate Saturdays, Sundays, and legal holidays." Fed. R. Civ. P. 6(a)(1)(A)-(B). The "last day ends . . . for electronic filing, at midnight in the court's time zone." Fed. R. Civ. P. 6(a)(4). Thus, excluding Wednesday, January 27th, the fourteenth day fell on Thursday, February 11, 2010. The rules, however, provide that, "[w]hen a party may or must act within a specified time after service and service is made under Rule 5(b)(2) . . . (E) . . . , 3 days are added after the period would otherwise expire under Rule 6(a)." Fed. R. Civ. P. 6(d). Rule 5(b)(2)(E) refers to service by electronic means, as occurred in this case. Because rule 72(b)(2) and 28 U.S.C. § 636(b) demand objections be filed within fourteen days after being served, the 3-day extension of rule 6(d) applies. See Fed. R. Civ. P. 72 advisory committee's note ("The 10-day period [increased to 14 days in 2009], as specified in the statute, is subject to Rule 6(e) [now rule 6(d)] which provides for an additional 3-day period when service is made by mail."). The objections were thus due on the first day after Sunday, February 14, 2010 -- three days after February 11, 2010 -- that was not a Saturday, Sunday, or legal holiday. See Fed. R. Civ. P. 6(a)(1)(C). Given that they were filed on February 14, 2010, the objections were timely filed.

undermined the proper functioning of the adversarial process that [it] cannot be relied upon as having produced a just result." Id.  A defendant can pursue an ineffective assistance of counsel claim by asserting that the process was not adversarial because of affirmative state interference or a conflict of interest, or by arguing that his or her attorney was so inadequate that he or she was effectively denied the benefit of full adversarial testing. See Osborn v. Shillinger, 861 F.2d 612, 626 (10th Cir. 1988).

With regard to ineffective assistance arising from a conflict of interest, in Osborn v. Shillinger, the United States Court of Appeals for the Tenth Circuit stated:

> The most common means by which an attorney may fail to function as his client's advocate in the absence of affirmative state interference involves a conflict of interest arising from multiple or dual representation.  An attorney may, however, abandon his "duty to loyalty" to his client through other sorts of conflicts as well. Whether the attorney is influenced by loyalties to other defendants, third parties, or the government, if he entirely fails to subject the prosecution . . . to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights.

861 F.2d at 625 (internal citations and quotations omitted).  A defendant who demonstrates that a conflict of interest actually affected the adequacy of his representation does not need to show prejudice to obtain relief.  See id. (citing Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980)).  In such situations, prejudice will be presumed.  The defendant must, however, "demonstrate[ ] that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." Strickland v. Washington, 466 U.S. at 692.  "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Cuyler v. Sullivan, 446 U.S. at 350.

With respect to ineffective assistance arising from inadequate lawyering, Strickland v. Washington provides the applicable two-part test:

First, the defendant must show that counsel's performance was deficient.  This

> requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair [proceeding] . . . .

Strickland v. Washington, 466 U.S. at 687. See United States v. Kennedy, 225 F.3d 1187, 1197 (10th Cir. 2000). The appropriate standard for attorney performance is that of reasonably effective assistance -- the defendant must demonstrate that counsel's representation, considering all the circumstances, fell below an objective standard of reasonableness based on prevailing professional norms. See Strickland v. Washington, 466 U.S. at 687-88. In evaluating an attorney's performance, the court must be highly deferential:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

> * * * *

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

Strickland v. Washington, 466 U.S. at 689-91 (internal citations and quotations omitted). See United States v. Kennedy, 225 F.3d at 1197 ("There is a strong presumption that counsel provided effective assistance, and a . . . defendant has the burden of proof to overcome that presumption.")

-5-

(quoting United States v. Williams, 948 F. Supp. 956, 960 (D. Kan. 1996)).

A defendant asserting ineffective assistance because of deficiency in attorney performance must also affirmatively prove prejudice.  See Strickland v. Washington, 466 U.S. at 693; United States v. Kennedy, 225 F.3d at 1197.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland v. Washington, 466 U.S. at 694.

### INEFFECTIVE ASSISTANCE BY DEPRIVATION OF RIGHT TO TESTIFY

The Fifth Amendment to the Constitution of the United States provides that criminal defendants cannot be compelled to testify against themselves.  See United States v. Rivas-Macias, 537 F.3d 1271, 1276-77 (10th Cir. 2008); U.S. Const. amend. V.  This clause has been construed to provide the defendant an absolute -- but waivable -- right to refuse to testify at his or her criminal trial.  See Czarlinsky v. United States, 54 F.2d 889, 894 (10th Cir. 1931)("The provision of the Fifth Amendment confers a personal privilege upon the accused that he may waive and testify in his own behalf.").  Conversely, however, due process requires that a criminal defendant have an absolute right to testify in his or her defense if the defendant so desires.  See Rock v. Arkansas, 483 U.S. 44, 51 (1987)("The right to testify on one's own behalf at a criminal trial . . . is one of the rights that 'are essential to due process of law in a fair adversary process.'")(quoting Faretta v. California, 422 U.S. 806, 819 & n.15 (1975));  Cannon v. Mullin, 383 F.3d 1152, 1171 (10th Cir. 2004)("A criminal defendant has a constitutional right to testify in his own behalf at trial.  The decision whether to testify lies squarely with the defendant; it is not counsel's decision.")(citing Rock v. Arkansas, 483 U.S. at 49-52).  The Tenth Circuit has taken this principle to the point that, if a defendants' counsel somehow prohibits the defendant from testifying in his own defense, it can constitute ineffective

assistance of counsel.  See Cannon v. Mullin, 383 F.3d at 1171 ("[If] counsel deprived him of the constitutional right to testify in his own defense[, s]uch a dereliction of duty by counsel would satisfy the first prong of Strickland."); PF&RD at 4 ("The right to testify and Strickland standard intersect where trial counsel interferes in some way with a defendant's decision to testify.").

On the other hand, although the defendant has an absolute right to testify if he or she chooses to take the stand, the defendant is usually represented by counsel who will likely have his or her own idea of what is the wisest trial strategy.  That strategy will often include a position on whether the defendant should testify in his or her defense, or rather assert his or her Fifth Amendment right not to testify.  The defendant, however, may have already decided that he or she would prefer to testify. The defendant's lawyer, generally wiser than the defendant in the ways of trial tactics, might disagree.  In such a situation, if the lawyer thinks that testifying is not in the defendant's best interest, he or she should discuss the issue with the defendant and try to dissuade him from testifying.  In such a situation, however, the defendant is the ultimate decision-maker and, even if the decision is wholly foolhardy, a defendant who wishes to testify has a constitutional right to do so.  See Jones v. Barnes, 463 U.S. 745, 751 (1983); Cannon v. Mullin, 383 F.3d at 1171 ("[C]ounsel lacks authority to prevent a defendant from testifying in his own defense, even when doing so is suicidal trial strategy.")(citing United States v. Janoe, 720 F.2d 1156, 1161 & n.10 (10th Cir. 1983)). The question thus arises: at what point does the attorney's effort to dissuade the defendant from testifying transform into an unconstitutional deprivation of the defendant's right to testify?

It is unlikely that anyone would argue that, as soon as the defendant states to the attorney that he would prefer to testify -- even if the attorney believes that such a decision will surely result in conviction -- the attorney should roll over and permit the defendant to testify.  Failure to even explain to the defendant why testifying in a particular case is unwise would seem to be just as much

ineffective assistance as outright forbidding him or her from testifying.  Indeed, it seems implicit in the attorney's duty to represent his client that the attorney would at least express his or her preference, and the reasons behind that preference.  See, e.g., Cannon v. Mullin, 383 F.3d at 1171 ("Counsel should . . . discuss with the defendant the strategic implications of choosing whether to testify, and should make a recommendation to the defendant.").  Clearly some degree of opposition by the attorney to the defendant's request to testify must be permissible.  The question is what degree is permissible -- at what point does counsel's insistence that testifying is a bad decision become denying the defendant the right to testify.

### 1. **Tenth Circuit Case Law on Assertion of Right to Testify.**

Few cases from the Tenth Circuit have addressed this question directly, but those that have spoken on the issue indicate something more than merely asking counsel for the opportunity to testify is necessary to assert one's right to testify.  In Cannon v. Mullin, the Tenth Circuit considered a state criminal defendant's federal habeas petition.  One basis for relief was Cannon's claim that counsel denied him the right to testify.  See 383 F.3d at 1170.  The Tenth Circuit broadly stated that, if "counsel . . . prevent[s] a defendant from testifying in his own defense," then such conduct "would satisfy the first prong of Strickland."  Cannon v. Mullin, 383 F.3d at 1171.  The facts alleged were rather egregious:

> 1.     In more than one pre-trial conference petitioner informed trial counsel that the petitioner wished to testify on petitioner's own behalf.  Trial counsel was against this decision.  Through the course of several pre-trial discussions concerning this issue petitioner would never relent or change his position and desire to testify on his own behalf.  Trial counsel also refused to relent or change the position of being against petitioner's desire to testify on his own behalf.  At the beginning of trial petitioner reiterated to trial counsel his desire to testify on his own behalf.

> 2.     Upon petitioner's request to trial counsel to testify on his own behalf, trial counsel became enraged and abandoned her previous finesse technique and went to an aggressive bulldog approach and responded to petitioner, "Judge Hopper assigned

me to represent this case and I am the captain of the ship and I make all decisions concerning this case and I say you're not going to testify, besides our witness list is already in and you are not on it so you couldn't testify anyway." Petitioner still maintained his wish to testify.

3.     When the State rested its case and the Judge called for the defense to present its side, Petitioner started to fix his jacket to get ready to take the witness stand to testify on his own behalf.  Trial counsel was well aware of the petitioner's wish to testify.  In order to purposely sabotage and subvert petitioner's right to testify on his own behalf when the Judge called for the defense, trial counsel quickly sprang out of the chair and said that the defense rests in order to cut the petitioner off, full well knowing the petitioner couldn't afford an incident in front of the jury.

383 F.3d at 1170-71 (alterations omitted).  The Tenth Circuit held that, if the facts that Cannon alleged were true, he would satisfy the first prong of Strickland, and thus reversed the district court's summary dismissal of the habeas petition and remanded for an evidentiary hearing.  See Cannon v. Mullin, 383 F.3d at 1172.

In Underwood v. Massie, 75 Fed. Appx. 747 (10th Cir. 2003), the Tenth Circuit addressed a state-court criminal defendant's federal habeas petition, in which she argued that her counsel was ineffective because her counsel "stood in the way" of her right to testify at the trial of her case.  75 Fed. Appx. at 748-49.  The Tenth Circuit denied Underwood relief for two reasons.  First, Underwood "[did] not explain how her trial counsel" impeded her right to testify.  Id.  Second, the Tenth Circuit based its decision on the trial record.

[T]he transcript does not support petitioner's assertion that her trial counsel prevented her from testifying.  The transcript indicates that her trial counsel announced in open court at the close of the state's case that he would not be calling petitioner to testify.  The record does not reflect any objection by petitioner to this assertion at the close of the state's case, nor does it indicate she raised any objection at the close of the defense case or at any other time.

75 Fed. Appx. at 749 (citing United States v. Janoe, 720 F.2d at 1161 n.9).  Underwood v. Massie thus leaves open the possibility that a defendant must alert the Court that he or she wishes to testify and has not been afforded that opportunity, and failure to do so waives the right.

-9-

In United States v. Vazquez-Pulido, 45 Fed. Appx. 833 (10th Cir. 2002), the Tenth Circuit addressed whether to grant a certificate of appealability to an inmate who had been unsuccessful in seeking a writ of habeas corpus from the federal district judge under 28 U.S.C. § 2255.[2]  Vazquez-Pulido's primary argument was that his trial counsel was ineffective by denying him the right to testify.  See 45 Fed. Appx. at 834.  The Tenth Circuit found that, in light of the magistrate judge's findings that "defendant was aware of his right to testify, that trial counsel always advised his clients that they had the right to testify and did not deviate from this practice with defendant, that counsel recommended that defendant not take the stand but did not order defendant not to testify, that defendant trusted his counsel and took this advice, and that defendant did not insist that he be called to testify," reasonable jurists would not find the district court's rejection of Vazquez-Pulido's ineffective-assistance claim to be debatable or wrong.  United States v. Vazquez-Pulido, 45 Fed. Appx. at 835.

In Hooks v. Ward, 184 F.3d 1206 (10th Cir. 1999), a habeas proceeding seeking relief from confinement under state law, the Tenth Circuit reviewed an Oklahoma court's finding that Hook's counsel was not ineffective for allegedly prohibiting Hooks from testifying at the sentencing phase of his trial.  See 184 F.3d at 1218-19.[3]  After recounting the general principles of ineffective

_____

[2]  The standard applied in this opinion requesting a certificate of appealability is different from that applied in habeas review under 28 U.S.C. § 2255, so the case is not on point.  See Boutwell v. Keating, 399 F.3d 1203, 1211 (10th Cir. 2005)("To meet [the certificate-of-appealability standard of 28 U.S.C. § 2253(c)], a petitioner must demonstrate 'that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'").  The Court believes, however, that it still provides useful principles to apply in review of ineffective-assistance claims based on denial of the right to testify.

[3]  The standard of review applied to habeas petitions seeking relief from confinement by the state under 28 U.S.C. § 2254 is also different from the standard applied to 28 U.S.C. § 2255 motions seeking release from federal custody.  In the former, release is generally available only where "the

assistance, the Tenth Circuit recounted the Oklahoma Court of Appeals' analysis:

> Whether a defendant will testify on his own behalf at a criminal trial is a decision properly left to the accused. Assuming Hooks was influenced by defense counsel's advice, which may have suggested that he not testify, such advice is a matter of trial strategy and will not be considered ineffective assistance of counsel. Hooks has failed to establish defense counsel's performance was deficient. Even if we were to assume that defense counsel's performance was deficient, he has failed to demonstrate any possibility that, but for counsel's errors, the result of the trial would have been different. This assignment of error is denied.

184 F.3d at 1218-19 (quoting Hooks v. State of Oklahoma, 862 P.2d 1273 (Crim. App. 1993))(internal citations omitted). After finding this analysis to be "a reasonable application of Strickland," the Tenth Circuit found further support for the state court's holding in the transcript of the federal district court's evidentiary hearing on the habeas petition. The Tenth Circuit put particular emphasis on the following exchange with the defendant's counsel from that hearing:

> Q.    Why did you decide not to present Hooks as a witness in the second stage?
>
> A.    I didn't think he would make a good witness. Was he a good witness on -- was he ready to be a good witness on May, whatever day, the 10th, that he would have testified? I didn't think so. That was my call at the time.
>
>       I don't remember ordering him not to testify or telling him that he would not be allowed to testify. I don't remember him insisting on testifying.

184 F.3d at 1218-19 (alterations omitted). In reference to that snippet of testimony, the Tenth Circuit reminded the lower courts "of Strickland's command that '[j]udicial scrutiny of counsel's

---

state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," Douglas v. Workman, 560 F.3d 1156, 1170 (10th Cir. 2009)(quoting 28 U.S.C. § 2254). Section 2255 allows relief where the sentence imposed was "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack" 28 U.S.C. § 2255. Because the § 2245 standard is more deferential to the state courts than the § 2255 standard is to federal courts, § 2254 decisions are not on point, but nonetheless provide general principles for ineffective-assistance claims in a right-to-testify context.

performance must be highly deferential,' and its admonition not to indulge in the temptation to 'second-guess counsel's assistance after . . . adverse sentence,'" and found that it "cannot say that Hooks' counsel performed below the prevailing professional norms in advising Hooks not to testify." Hooks v. Ward, 184 F.3d at 1219.

Hooks v. Ward is, of course, distinguishable from other cases in that it refers to counsel's influence over the defendant's decision to testify at the sentencing, rather than the merits, phase of the criminal proceeding. Nevertheless, it implies that it is not unreasonable -- and not ineffective assistance -- for counsel to decide whether he or she believes the defendant should testify, and to assert that decision to the defendant, so long as counsel does not "order[ the defendant] not to testify or tell[] him that he would not be allowed to testify." Id. The decision also reinforces the possible principle inferred from Underwood v. Massie that there is some burden on the defendant to "insist on testifying" before counsel's decision not to put the defendant on the stand will constitute ineffective assistance. 184 F.3d at 1219. The defendant stating his or her preference is likely not enough to preserve the right to testify if counsel advises the defendant against testifying and the defendant does not press the matter further.

A year earlier, in Wimberly v. McKune, 141 F.3d 1187 (Table), 1998 WL 115953 (10th Cir. Mar. 16, 1998), a panel of the Tenth Circuit set down a three-part test for determining when counsel's influence over the defendant's decision not to testify went beyond advice and reached the point of being coercion. See 1998 WL 115953, at **3-4. The Tenth Circuit stated that, "[i]n drawing the difficult line between earnest counseling and the overt coercion which amounts to ineffective assistance," id., courts should consider:

> (1) whether the defendant knew about his constitutional right to testify, and if not, whether he was informed by counsel; (2) the competence and soundness of defense counsel's tactical advice, i.e., whether counsel presents the defendant with sufficient

> information to permit a meaningful voluntary waiver of the right to testify; and (3) any intimidation or threatened retaliation by counsel relating to the defendant's testimonial decision.

1998 WL 115953, at **3-4 (quoting Lema v. United States, 987 F.2d 48, 52-53 (1st Cir. 1993)). This test seems to differ from those applied in later cases in the Tenth Circuit, in that it places less emphasis on what actions the criminal defendant took to ensure his right to testify, and places the emphasis on what steps the attorney took to preserve or restrict that right. Nevertheless, one can distill two principles from these cases. First, to preserve his right to testify, the defendant must do something more than simply state his or her preference for testifying. At the extreme, the defendant may be required to bring the issue to the attention of the judge and explain that he or she would like to testify and counsel has refused to call him or her as a witness. At the least, it appears, the defendant must clearly express to his or her attorney that, notwithstanding the attorney's recommendation to the contrary, he or she would still like to testify. Second, if the defendant's failure to take these steps is because of his or her ignorance of the right to testify or because of counsel's threats or intimidation, the defendant's waiver of the right to testify was not knowing and/or voluntary, and the court can find counsel's assistance ineffective.[4]

## 2.    Case Law from Other Circuits Regarding Assertion of Right to Testify.

The principles that the Court has distilled from Tenth Circuit case law appear to be the same as those several other circuits use in resolving the issue whether counsel is ineffective for not allowing a defendant to testify on his own behalf. In Hodge v. Haeberin, 579 F.3d 627 (6th Cir. 2009), the United States Court of Appeals for the Sixth Circuit had to resolve a habeas petitioner's

---

[4] As the Judge Molzen recognized in the PF&RD, a defendant can waive a constitutional right so long as that waiver is knowing and voluntary. See PF&RD at 6 (citing Florida v. Nixon, 543 U.S. 175, 187 (2004)).

argument that "trial counsel performed ineffectively by preventing Hodge from testifying despite

Hodge's stated desire to do so." 579 F.3d at 639. Although it based its decision to deny Hodge's

petition on a procedural default, the Sixth Circuit noted that Hodge's claims would fail in any event,

stating:

> A defendant who wants to testify can reject defense counsel's advice to the contrary
> by insisting on testifying, communicating with the trial court, or discharging counsel.
> At base, a defendant must alert the trial court that he desires to testify or that there
> is a disagreement with defense counsel regarding whether he should take the stand.
> When a defendant does not alert the trial court of a disagreement, waiver of the right
> to testify may be inferred from the defendant's conduct. Waiver is presumed from
> the defendant's failure to testify or notify the trial court of the desire to do so.

579 F.3d at 640 (quoting United States v. Webber, 208 F.3d 545, 551 (6th Cir. 2000)). See United

States v. Bass, 460 F.3d 830, 839 (6th Cir. 2006)("We have held that, unless a defendant alerts the

court that he wishes to testify or that there is a disagreement with counsel regarding his testifying,

we presume he has waived the right to testify.")(citing United States v. Webber, 208 F.3d at 551).

In a brief, unpublished decision by the United States Court of Appeals for the Eighth Circuit,

the court stated that "[a] defendant who does not alert the trial court that he wishes to testify when

his attorney rests without calling him to the stand has waived his right to testify." United States v.

Hayes, 56 Fed. Appx. 294, 295 (8th Cir. 2003)(citing United States v. Bernloehr, 833 F.2d 749,

751-52 (8th Cir. 1987)). The Eighth Circuit found that Hayes "did nothing at trial to signal the

District Court that he disagreed with his counsel's decision to rest without Hayes' testimony," and

therefore affirmed the district court's finding that Hayes waived his right to testify. 56 Fed. Appx.

at 295.

The United States Court of Appeals for the Eleventh Circuit in Cuthbert v. United States, 296

Fed. Appx. 904, 906-07 (11th Cir. 2008), found that Cuthbert's trial counsel did not

unconstitutionally prohibit him from testifying because "Cuthbert was aware of his right to testify

and did not insist on testifying."  296 Fed. Appx. at 907.  The Eleventh Circuit's opinion is not

helpful in determining what level of "insistence" by the defendant is required, but the term "insist"

implies something beyond an initial assertion.  See Oxford English Dictionary Online, "insist, *v.*"

(2d ed.1989, Oxford University Press), available at http://dictionary.oed.com/cgi/entry/50118065

(last accessed April 24, 2010)("**2.  a.**  *intr.*  To continue steadfastly or persist in a course of action

. . . ; to continue with urgency; to persevere. . . . **3.  a.**  *intr.* . . . ***to insist on*** = to assert or maintain

persistently.");  The American Heritage Dictionary of the English Language at 934 (3d ed. 1992)

("**in•sist** . . . To be firm in a demand or course; refuse to yield . . .  To assert or demand (something)

vehemently and persistently").  See also Geer v. United States, 354 Fed. Appx. 417, 419-20 (11th

Cir. 2009)(reversing a district court's dismissal of a habeas petition without holding an evidentiary

hearing because the first prong of the Strickland test might be satisfied where Geer "demanded to

testify on multiple occasions, but defense counsel rested without allowing him to do so.").

Ultimately, however, as the United States Court of Appeals for the Seventh Circuit has recognized,

"there is no standard clearly established by the Supreme Court of the United States that is binding

on all" with respect to this issue.  Thompson v. Battaglia, 458 F.3d 614, 619 (7th Cir. 2006).

## ANALYSIS

Citing cases from other jurisdictions, Hanrahan asks the Court to disregard the Magistrate

Judge's credibility findings, conduct a second hearing, and make its own credibility determination.

See Objections at 4.  The Court declines to hold a second hearing.  Contrary to Hanrahan's

suggestion, the Supreme Court of the United States' decision in United States v. Raddatz, 447 U.S.

667 (1980), does not mandate that result.  In the Tenth Circuit,

> [i]f a party files objections to the magistrate judge's credibility findings, the district
> court must undertake a de novo review of the record, which includes reading the
> transcript of the evidentiary hearing.  See Gee v. Estes, 829 F.2d 1005, 1008-09

(10th Cir. 1987).  However, a <u>de</u> <u>novo</u> hearing is not required if the court adopts the magistrate judge's recommendation.  <u>See</u> <u>United States v. Orrego–Fernandez</u>, 78 F.3d 1497, 1501 (10th Cir. 1996); <u>see</u> <u>also</u> <u>United States v. Raddatz</u>, 447 U.S. 667, 681 n.7 (1980)(district court's rejection of a magistrate judge's proposed findings on credibility without seeing and hearing the witness whose credibility was at issue could give rise to serious questions).  Because the district court accepted the magistrate judge's findings and credibility determination, a <u>de</u> <u>novo</u> hearing was not required.

<u>Wildermuth v. Furlong</u>, 147 F.3d 1234, 1236 (10th Cir. 1998).  The only way in which the Supreme Court in <u>United States v. Raddatz</u> limited a district court's treatment of a Magistrate Judge's credibility determinations is by finding that a district court's failure to adopt the Magistrate Judge's finding of credibility without an independent hearing could "give rise to serious questions."

Neither the statute nor its legislative history reveals any specific consideration of the situation where a district judge after reviewing the record in the process of making a <u>de</u> <u>novo</u> 'determination' has doubts concerning the credibility findings of the magistrate.  The issue is not before us, but we assume it is unlikely that a district judge would reject a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions which we do not reach.

447 U.S. at 681 n.7.  <u>See</u> <u>id.</u> at 673-76 (rejecting the argument that "the District Court was required to rehear the testimony on which the Magistrate based his findings and recommendations in order to make an independent evaluation of credibility.").  The Court overrules Hanrahan's request to hold a de novo hearing.  <u>See</u> Objections at 4.

The Court has carefully reviewed both the transcript and the objections <u>de</u> <u>novo</u>.  The Court finds that the objections lack a sound basis in law or in the facts of the case.  The Court does not agree with every statement contained in the PF&RD, but finds that it comes to the correct result.  Specifically, the Court does not agree with the Judge Molzen's discussion of credibility with respect to Hanrahan and his trial counsel, but finds that this disagreement does not effect the outcome of the case or require the Court to re-hear the testimony, which would not likely change.

-16-

I.     **THE COURT ADOPTS THE PF&RD'S CONCLUSION THAT HANRAHAN'S TRIAL COUNSEL WAS NOT INEFFECTIVE.**

The only basis upon which Hanrahan asserts his counsel's representation was ineffective is that she allegedly deprived him of his due-process right to testify in his defense. Judge Molzen found that, notwithstanding Hanrahan's assertion to the contrary, Hanrahan's trial attorney, Jane Greek, did not force him to waive his right to testify at his second trial. See PF&RD at 12-15. Judge Molzen couched this decision in terms of credibility, finding Ms. Greek's "testimony entirely credible" and finding Hanrahan's "rendition of the facts incredible." Id. at 12-13. On the other hand, Judge Molzen found that "some portions of [Hanrahan's] testimony rang true and others false," indicating that she found him credible with respect to some issues.

First, the Court finds that, although Judge Molzen couched her findings in terms of credibility, her decision was not based -- at least solely -- upon her credibility determination. A reasonable interpretation of Judge Molzen's PF&RD is that she credited all of Hanrahan's factual testimony and, in the end, disagreed with him upon the legal result of those facts. Judge Molzen's analysis included the following account of the exchange between Ms. Greek and Hanrahan:

> First, . . . I believe Hanrahan did initially want to take the stand and expressed that to his counsel. I also believe that Ms. Greek strongly advised him against it[,] warning that "the government needs (sic) no rocks unturned" if he was subject to cross-examination.
>
> On the other hand, I am convinced that Hanrahan chose to heed his attorney's warning. He acknowledged that Ms. Greek had told him that she wouldn't be putting him on the stand, and that "I put my trust in her because she's a professional with the experience of being a trial attorney, and I surely did not want to make a scene in front of the jury." Moreover, Ms. Greek had co-counsel present at the trial, and Petitioner concedes that he never discussed with Ms. Mandel any displeasure with Ms. Greek's trial strategy during the proceedings. Petitioner also made absolutely no effort to alert the Court to this alleged disagreement about strategy until these habeas proceedings.

PF&RD at 13. Nothing in this synopsis is contrary to Hanrahan's factual testimony, so the Court

does not find that its decision to credit Hanrahan's testimony is a credibility determination which is adverse to that made by Judge Molzen.  Furthermore, to the extent that the Court disagrees with the Judge Molzen as to Hanrahan's credibility, such credibility findings are in Hanrahan's favor and do not change the Court's ultimate conclusion that Ms. Greek did not violate Hanrahan's constitutional rights.  Also, for these reasons, the Court is further convinced that it need not hold a new evidentiary hearing to assess Hanrahan's credibility.

Hanrahan's subjective beliefs and desires -- the only part of his testimony that Judge Molzen found incredible -- cannot render his counsel's assistance ineffective if he did not properly bring those beliefs and desires to his counsel's attention.  The Court will thus adopt Judge Molzen's credibility determinations in which she found the witnesses credible.  The Court will also find Hanrahan credible as to all relevant objective facts -- those relating to the exchange between Hanrahan and Ms. Greek -- and finds Hanrahan's testimony as to these facts consistent with Ms. Greek's testimony.

Ms. Greek discussed with Hanrahan his choice whether to testify at both trials.  See Transcript of Hearing at 29:21-25 (taken December 21, 2009), filed January 13, 2010 (Doc. 21) ("Tr.")(Patton, Greek); Tr. at 12:8:16 (Hannum, Hanrahan).  From the Court's de novo review of the record, it appears that Hanrahan expressed his desire to testify at two points during the second trial.  See Tr. 22:22-23:3 (Patton, Hanrahan).  As he testified at Judge Molzen's evidentiary hearing, the first thing Hanrahan said to Ms. Greek when he entered the courtroom for his second trial was, "good morning . . . I'm ready to get up on the stand and testify."  Tr. 8:7-14 (Hannum, Hanrahan).  To that, Ms. Greek responded: "We're not putting you on the stand."  Tr. at 8:14-15 (Hanrahan).  See Tr. at 8:21-9:1 (Hanrahan).  Ms. Greek did not recall exactly what she told to Hanrahan, so Hanrahan's testimony was, by default, consistent with Ms. Greek's.  See Tr. at 32:10-18 (Patton,

Greek)("Q: Did you ever tell Mr. Hanrahan, 'We're not putting you on the stand'?  A: I don't recall

that. . . .   In the heat of trial, things get said, and I do not recall my words to Mr. Hanrahan,

exactly."); id. at 38:6-13 (Hannum, Greek)("Q: And you don't, today, have specific recollection of

the exact content of these conversations, do you?  A: I do not.").

There was apparently a short exchange between Hanrahan and Ms. Greek at this point.

When Hanrahan's counsel asked him if he ever pursued his right to testify with Ms. Greek,

Hanrahan responded: "No. . . . she told me that she wasn't going to put me on the stand because the

government needs [sic] no rocks unturned."  Tr. at 9:5-10 (Hannum, Hanrahan); id. at 24:9:17

(Patton, Hanrahan).  Ms. Greek thus conveyed to Hanrahan the tactical basis for not putting

Hanrahan on the stand.  Hanrahan testified that he explained to Ms. Greek that he believed he should

testify because it worked well in the first trial and that he would prefer that he tell his story than

have one of the United States' witnesses read in his testimony from the first trial.  See id. at 9:11-

11:5 (Hannum, Hanrahan).

At that point, Ms. Greek apparently reassured Hanrahan, telling him "it would be all right,"

and Hanrahan dropped the issue.  Tr. at 11:7-10 (Hannum, Hanrahan).  Hanrahan testified that, at

that point, he had to trust his counsel.  See Tr. at 11:13-14 (Hanrahan)("Well, at that point, you

know, with her experience, I can only trust in her . . . .").  He stated: "[Ms. Greek] had told me the

reason why I'm not getting up on the stand was to protect my rights, and she was afraid that I was

going to get on the stand and Ms. Patton was going to -- no disrespect -- but drill me, you

know . . . ."  Tr. at 11:19:23 (Hanrahan).  When his habeas attorney, Eric Hannum, asked Hanrahan

whether Ms. Greek had explained to him his right to testify, Hanrahan said, "Yes."  Tr. at 12:8:16

(Hannum, Hanrahan).  It thus appears that Ms. Greek fulfilled both obligations, to explain to

Hanrahan his right to testify and to explain to him the reasons why he should not testify in this

second trial.  See Tr. at 12:8-25 (Hannum, Hanrahan).  Hanrahan's testimony demonstrates that, at this point, he backed off the issue and trusted in his attorney's evaluation of whether he should testify.

Ms. Greek did not recall the details of her discussions with Hanrahan.  She could state only that she did not recall refusing to allow Hanrahan to testify in his second trial.  See Tr. at 30:7-10 (Patton, Greek).  She was, however, able to testify about her general practices in her seventeen years as a public defender.  When asked if she would "ever, under any circumstances, refuse to allow . . . a defendant to testify in trial," she stated that she would not.  Tr. at 30:10-13 (Patton, Greek).  She stated that, because Hanrahan had testified in the first trial, she would have advised him not to testify because of the potential for impeachment, especially when he did not have anything substantive to add to his prior testimony, which was read into evidence.  See id. at 30:24-32:3 (Patton, Greek).  She acknowledged, however, that she was cognizant that it was ultimately the defendant's decision whether to testify, and that, in her seventeen years as a defense attorney, she could not recall ever prohibiting a defendant from testifying when they insisted upon it.  See id. at 30:15-20 (Patton, Greek); id. at 35:6-9 (Patton, Greek).  None of her testimony was inconsistent with Hanrahan's testimony.

At this point in the habeas hearing, Hanrahan characterized his interaction with Ms. Greek as "really push[ing] the issue" of him testifying, and stated that Ms. Greek left "no doubt when she told [Hanrahan] she wasn't going to put [him] on the stand," Tr. at 13:1-9 (Hannum, Hanrahan), but, at the same time, Hanrahan stated that he "put [his] trust in her because she's a professional with the experience of being a trial attorney, and [he] surely didn't want to make a scene in front of the jury," Tr. at 13:8-13 (Hanrahan), and that he "wasn't real upset" at the decision that he would not testify, Tr. at 13:20-21 (Hanrahan).  In light of his factual testimony, the Court finds that, although

Hanrahan might have felt that he "really pushed the issue," he did not adequately bring to Ms.

Greek's attention that he disagreed with her decision not to call him to testify.  Furthermore,

Hanrahan's testimony was that he trusted in Ms. Greek's experience as a trial attorney, implying

that, although grudgingly, he heeded her advice that he not testify.  <u>See</u> Tr. at 11:13:23 (Hanrahan);

<u>id.</u> at 13:8-21 (Hanrahan).  Furthermore, although Hanrahan had two attorneys for his second trial,

he never raised the issue with Ms. Mandel, his other attorney, <u>see</u> Tr. at 14:2-4 (Patton, Hanrahan),

or with the judge.  As Judge Molzen apparently concluded, <u>see</u> PF&RD at 13-14, this situation looks

like one in which Hanrahan was persuaded by Ms. Greek's advice not to testify, and only after the

second jury convicted him did he decide that Ms. Greek's advice must have been ineffective

assistance.  Indeed, in argument to Judge Molzen, Mr. Hannum conceded that the conclusion that

Ms. Greek persuaded Hanrahan it was in his best interest not to testify, rather than that she forced

him not to testify, was "an inference that could be drawn from the evidence that [Judge Molzen]

ha[d]."  Tr. at 40:18:41-1 (Judge Molzen, Hannum).

   Under Tenth Circuit law, Ms. Greek's conduct did not amount to depriving Hanrahan of his

due-process right to testify in his defense.  Hanrahan did not allege that Ms. Greek engaged in any

"aggressive bulldog approach" to bully him into not testifying, as Cannon alleged his counsel did

in <u>Cannon v. Mullin</u>.  Hanrahan raised no objection to Ms. Greek's decision not to call him as a

witness, which the Tenth Circuit left open as a possible requirement in <u>Underwood v. Massie</u>.  As

was the case in <u>United States v. Vazquez-Pulido</u>, Hanrahan

> was aware of his right to testify, . . . trial counsel always advised [her] clients that
> they had the right to testify and did not deviate from this practice with defendant, . . .
> counsel recommended that defendant not take the stand but did not order defendant
> not to testify, . . . defendant trusted his counsel and took this advice, and . . .
> defendant did not insist that he be called to testify.

45 Fed. Appx. at 835.  Thus, it is likely that "reasonable jurists" would agree that no constitutional

violation has occurred in this case.  And, as was true in <u>Hooks v. Ward</u>, Ms. Greek did not recall telling Hanrahan that he would not be allowed to testify, nor did she recall Hanrahan insisting on testifying.

Based on the entire record, and the context in which they were made, the Court does not believe Ms. Greek's two alleged statements -- "We're not putting you on the stand," Tr. at 8:12-15 (Hanrahan), and "You're not testifying," Tr. at 24:13-19 (Hanrahan) -- constitute orders not to testify; rather, the Court finds they were part of the rigorous discussion that Ms. Greek had with Hanrahan in the heat of trial.  The Court has had at least two trials with Ms. Greek, and numerous hearings, and believes that Hanrahan has accurately stated how she talks in an argument.  The Court recognizes Ms. Greek's statements as what they are -- argumentative assertions.  It appears that Hanrahan -- who had even more experience with Ms. Greek that the Court has had -- recognized Ms. Greek's two statements as part of the discussion as well, and he never says Ms. Greek "ordered" him not to testify.

Even applying the three-part test enunciated in <u>Wimberly v. McKune</u>, the Court finds that Ms. Greek's assistance did not cross "the difficult line between earnest counseling and the overt coercion which amounts to ineffective assistance."  1998 WL 115953, at **3-4.  Hanrahan admitted that he knew of his constitutional right to testify, satisfying the first prong.  While some might debate the wisdom of Ms. Greek's decision not to call Hanrahan to testify at the second trial, Ms. Greek explained to Hanrahan her concerns about putting him on the stand while the prosecution was in possession of the transcript of his prior testimony -- impeachment, even on minor points, can often shatter a defendant's credibility before a jury.  <u>See</u> Tr. at 11:19:23 (Hanrahan)("[S]he was afraid that I was going to get on the stand and Ms. Patton was going to . . . drill me, you know . . . .").  Hanrahan thus had "sufficient information to permit a meaningful voluntary waiver

of the right to testify," satisfying the second prong.  1998 WL 115953, at *4.[5]  Finally, although

Hanrahan stated that he felt that Ms. Greek left "no doubt" that Hanrahan would not testify, the

Court does not believe that Ms. Greek's assertive voice could be the kind of "intimidation or

threatened retaliation by counsel" to which the Tenth Circuit in Wimberly v. McKune referred.  Id.

The Court thus finds that, regardless which of the Tenth Circuit's standards it applies, Ms. Greek's

conduct did not amount to ineffective assistance by depriving Hanrahan of his right to testify.[6]

---

[5] There was another change in circumstance between the first and second trial: the Court held that a prior conviction that was not mentioned in the first trial could potentially be used to impeach Hanrahan if he testified in the second trial.  See Tr. at 21:3-8 (Patton, Hanrahan); United States v. Hanrahan, No. CR 04-1978 JB, Order of Mistrial, filed August 3, 2005 (Doc. 63); United States v. Hanrahan, No. CR 04-1978 JB, Memorandum Opinion and Order at 8, filed November 9, 2005 (Doc. 80)(granting in part and denying in part the United States motion in limine to permit it to impeach Hanrahan with a prior felony conviction).  Although no party went into the details of this prior conviction during the habeas evidentiary hearing, the Court notes the possibility of a prior conviction coming into evidence before the jury is a further basis for preferring that Hanrahan not testify, so that he could not be impeached with such harmful evidence.

[6] The Court also notes that Hanrahan's position in his motion for relief is somewhat inconsistent with his assertions in his reply brief and at Judge Molzen's evidentiary hearing.  In his motion, Hanrahan's "Ground Seven" for relief was for violation of his Fifth Amendment right not to testify, asserting "Hanrahan chose not to testify in this new trial and no new testimony should have been allowed."  Memorandum of Law in Support of Supplemental Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 at 47, filed March 4, 2009 (Doc. 1-1). Although he mentioned in one paragraph that Ms. Greek's failure to put him on the stand was also ineffective assistance, see id. at 45, the real thrust of this ground for relief was that Hanrahan's Fifth Amendment right was infringed when a witness for the United States read Hanrahan's prior testimony into evidence after Hanrahan had asserted his right not to testify.  The United States characterized this issue as "whether counsel was ineffective because the petitioner chose not to testify at the re-trial of the case."  Government's Response to Petitioner's Motion to Vacate, Set Aside, or Correct Sentence at 3, filed April 2, 2009 (Doc. 6).  In his reply brief, Hanrahan switches approach and asserts that Ms. Greek "denied" or "prevented" him from testifying, rather than that he "chose" not to testify.  Petitioners [sic] Reply to Governments [sic] Response to Petitioners [sic] Motion to Vacate, Set Aside, or Correct Sentence at 15-16, filed June 4, 2009 (Doc. 10).  The Court finds that this late development of the grounds of ineffective assistance weighs in favor of finding that Ms. Greek did not deprive Hanrahan of his right to testify.

## II.   THE COURT ADOPTS THE PF&RD'S CONCLUSION THAT HANRAHAN HAS FAILED TO SHOW THAT THE OUTCOME WOULD BE DIFFERENT IF HE HAD TESTIFIED AT THE SECOND TRIAL.

Even if Hanrahan were able to prove that Ms. Greek had deprived him of his due-process right to testify in his own defense, which the Court does not find, he would still have to prove that this deprivation harmed him.  See Strickland v. Washington, 466 U.S. at 693; United States v. Kennedy, 225 F.3d at 1197.  Judge Molzen found, after finding that Ms. Greek did not deprive Hanrahan of his right to testify, that, in the alternative, there was no harm.  She wrote:

> I find that there is no reasonable possibility Petitioner's testimony would have altered the result in this case.  The substance of his proposed testimony was before the jury at the second trial.  Hanrahan would have been subject to rigorous cross-examination with additional discrediting (yet another prior felony conviction) and could have been impeached with even the smallest of discrepancies with the prior testimony.  Reasonable jurors would have perceived this self-serving testimony as I have.  Thus, I also find that Petitioner fails to meet the second prong of Strickland.

PF&RD at 15.  The Court agrees with Judge Molzen's assessment.

First, a defendant in a criminal case is often at an advantage over a similarly situated defendant in a civil case because there is no sworn statement by the defendant, such as a deposition or affidavit.  Without such a statement, the prosecution has substantially fewer opportunities to impeach the defendant with a prior inconsistent statement.  Upon re-trial, if the defendant testified in the first trial, that advantage goes out the window.  The testimony of the first trial is a sworn statement that the prosecution can use to impeach the defendant's testimony at the second trial.  See, e.g., Fed. R. Evid. 801(d)(1)(A) (declaring inconsistent prior testimony, under oath, to be non-hearsay).  That could have happened in this case.  If Hanrahan had not reviewed his prior testimony thoroughly and made sure he had his details straight, it is highly likely that Ms. Patton could have found several spots in which to impeach Hanrahan, decreasing his credibility.

Second, in this case, Hanrahan's trial testimony from his first trial was read into evidence.

-24-

At least in terms of content, therefore, he was able to get all of his prior testimony into evidence. His side of the story was represented. Moreover, Hanrahan was unable to tell Judge Molzen what more he would have added if he had testified. His arguments appear to be: (i) that the jury would have had an opportunity to get to know him as a person and thereby been more inclined to believe him, see Tr. at 10:22-11:6 (Hannum, Hanrahan); id. at 14:25-15:22 (Patton, Hanrahan); Objections at 3-4; and (ii) he would have been able to elaborate more and testify a little bit differently than, but not inconsistently with, his prior testimony, see Tr. at 15:18-16:16 (Patton, Hanrahan); Objections at 3-4 ("His testimony would have better and more thoroughly rebutted the testimony of the officers who arrested him."). What is lacking from the record, however, is how Hanrahan's testimony would have been different, and yet not subject him to impeachment with his prior testimony. Hanrahan testified that he believed he could have testified better than the United States' witness who read in his testimony, see Tr. at 10:22-11:6 (Hannum, Hanrahan), but he never explained how he would testify more effectively or why his prior testimony was, in his opinion, deficient. Without some indication of what new content Hanrahan would have proffered, the Court cannot comfortably conclude that Hanrahan's failure to testify live, when all of his testimony had been read to the jury, would be reasonably likely to change the outcome of the case. The Court is even less comfortable coming to that conclusion when it considers the likelihood that Ms. Patton would have impeached Hanrahan on the slightest inconsistency in his testimony.[7]

_____

[7] The Court rarely sees acquittals when the defendant does not take the stand, and there was a hung jury in the first trial when Hanrahan took the stand. Nevertheless, because all of Hanrahan's testimony was before the second jury, without any risk of impeachment, the Court does not believe that whether he took the stand was the determining factor. In the Court's opinion, the fact that the second jury was from urban Albuquerque, where citizens are often more hostile to guns, rather than from southern New Mexico, as in the first trial, was a more determinative factor of why the two juries dealt differently with very similar facts and evidence.

On cross-examination at the habeas hearing, Ms. Patton explored this issue and was equally

unsuccessful as Mr. Hannum in drawing out the details.

> Q.      And did you have anything different to testify to in Trial No. 2, or did you
> just want them [the jury] to get to know you?
>
> A.      It wasn't just a matter of getting to know me, I felt that, you know, there were
> some things after thinking out what happened that night, you know, with the officers'
> testimonies and how they had come after it, I think I would have testified just a little
> bit different.
>
> Q.      With a different defense theory?
>
> A.      No, with just the arguments of, you know, how the officers saying that my
> immediate reactions and stuff like that.
>
> Q.      So in contradiction of your first trial testimony, then?
>
> A.      No, it wouldn't be contradictory whatsoever. It's just, you know, like, I think
> -- I don't know, I'm not sure what the officer's name was, but, you know, him saying
> that my immediate reaction saying, "That's not a gun, that's a lighter" -- I mean,
> "That's not a lighter, it's a gun," you know, but I had actually thought before I said
> that, and he made it sound that I was immediately on it and jumped at the gun, you
> know, so . . . .

Tr. at 15:18-16:16 (Patton, Hanrahan). So far as the Court can discern, giving Hanrahan the benefit

of every doubt, the only thing he hoped to accomplish by testifying live at the second trial -- other

than having the jurors like him personally -- is to more thoughtfully answer the questions that had

been posed to him at the first trial. The Court has seen, in its own courtroom, that such efforts by

witnesses -- testifying to more detail at trial than they did in prior testimony -- is often a discrepancy

with which opposing attorneys will seek to impeach witnesses. If Hanrahan had given new details

regarding his encounter with these officers, Ms. Patton would have asked Hanrahan why he had not

mentioned those details in his prior statement. She would point out that the prior statement occurred

much closer to the time of the events in question, and thus Hanrahan's memory should be getting

worse, not better, as more time passes. These questions might have had the intended effect of

making the jurors doubt all of Hanrahan's testimony, rather than just those portions that Ms. Patton pointed to as different from the prior testimony.

While it is possible that, had Hanrahan testified in his own defense at the second trial, he would have been acquitted, the Court finds it at least equally probable that it would have made no difference in the outcome.  To the contrary, the most likely reason that the first jury hung and the second jury convicted Hanrahan is that these were two different juries.  While the Court has always believed, and likely will always believe, that the American jury system is the most fair way of resolving civil and criminal cases, the Court is also keenly aware that juries are often unpredictable. Because Hanrahan was unable to explain in any detail how his testimony in the second trial would have been different from his testimony in the first trial, because the first-trial testimony was read into evidence during the second trial, and because, if Hanrahan had testified in the second trial, the likelihood of impeachment on cross-examination would have been dramatically increased, the Court finds that Hanrahan has not satisfied the prejudice prong of the Strickland test. The Court therefore agrees with Judge Molzen's recommendations and conclusions, and adopts them. See Garcia v. City of Albuquerque, 232 F.3d 760, 766-67 (10th Cir. 2000).  Hanrahan's objections are overruled.

**IT IS ORDERED** that: (i) Defendant-Movant Robert Michael Hanrahan's objections are overruled; (ii) the Magistrate Judge's Proposed Findings and Recommended Disposition Following Evidentiary Hearing on Sole Remaining Issue is adopted; (iii) Hanrahan's remaining ground for habeas relief under 28 U.S.C. § 2255 is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Judith Patton
  Assistant United States Attorney
United States Attorney's Office
Western District of Texas
San Antonio, Texas

> *Attorney for the Plaintiff-Respondent*

D. Eric Hannum
Albuquerque, New Mexico

> *Attorney for the Defendant-Movant*